**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MURRAY FLOYD BRUCE** | : | |
|     **Plaintiff** | : | |
|     VS. | : | **3:CR-05-318** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **UNITED STATES OF AMERICA** | : | |
|     **Defendant** | : | |

## MEMORANDUM

On August 17, 2005, the Grand Jury for this District returned a two-count indictment against Defendant Murray Floyd Bruce. (Dkt. Entry 1.) Mr. Bruce was charged with: (1) seeking to prevent and hamper his removal from the United States in violation of 8 U.S.C. § 1253(a)(1)(C); and (2) making false representations to the Bureau of Immigrations and Customs Enforcement ("BICE") regarding his citizenship in violation of 18 U.S.C. § 1001(a)(2). It is the Government's contention that since the time of his initial entry into the United States on May 30, 1989, Mr. Bruce has falsely claimed to have been born in Bermuda in order to avoid being deported to Nigeria. In support of its case, the Government intends to introduce various statements made by Mr. Bruce, including a May 30, 1989 "record of sworn statement in affidavit form" made to U.S. immigration officials upon Bruce's arrival at the JFK Airport in New York City on a "transit without visa" status; an October 26, 1990 affidavit made by Mr. Bruce in connection with his assertion of unlawful detention; an August 31, 1991 affidavit made by Bruce in support of an application for judicial review; an affidavit of Mr. Bruce dated August 13, 2004, given to a BICE official while Bruce was serving a federal prison term on a bank fraud

conviction; and an August 3, 2005 "record of sworn statement" made by an immigration officer while Bruce was held in custody by BICE pending removal from the United States as a convicted felon. Bruce has moved to suppress the 1989 statement made upon his arrival in the United States as well as the 2004 and 2005 statements made when he was imprisoned on the ground that they were the products of custodial interrogations undertaken without <u>Miranda</u> warnings. (Dkt. Entry 23.) An evidentiary hearing was held on December 14, 2005. For the reasons that follow, Defendant's motion will be denied as to all statements.

**I.   BACKGROUND**

On May 30, 1989, a plane boarded by Defendant landed at JFK Airport in New York. Defendant was on "transit without visa" status, en route from Nigeria to Bermuda.[1] Upon arrival, Defendant was escorted from the airplane by officers of the United States Immigration and Naturalization Service ("INS") and taken to a secondary inspection area. Defendant was

---

[1] As explained in <u>Jiang v. Gonzales</u>, 425 F.3d 649, 650 n.1 (9th Cir. 2005):

> Aliens who are passing through the United States en route to another country are aliens in "transit-without-visa." 8 U.S.C. § 1101(a)(5)(C). An alien in TWOV arrives at a port of entry under special agreements with air carriers and transportation lines, which guarantee the alien's immediate and continuous passage to a foreign destination.

Regulations in effect at the time of Bruce's arrival in the United States provided that an alien in transit without visa status must be "in possession of a travel document or documents establishing his/her identity and nationality and ability to enter some country other than the United States." 8 C.F.R. § 212.1(f)(1) (1989).

questioned by several officers at this inspection area without being given any Miranda warnings. The office in which the questioning occurred was locked from the outside, and Bruce was not free to leave. Defendant was asked questions about his name, citizenship, and the authenticity of his travel documents. After extended separate interrogations on these matters by several different officers, Bruce was informed that he would not be allowed to enter Bermuda with the travel documents he possessed and that he would be returned to Nigeria. Bruce responded to this news by stating that he would not return to Nigeria because he had just been deported from there and he feared for his safety if he were compelled to return. At that point, Bruce was requested to provide a written statement. As a result, Defendant signed a document titled, "Record of Sworn Statement in Affidavit Form." (Gov.'s Ex. 1.)

In this document, Bruce acknowledged that his statement concerned his "admissibility into the United States/transit without a visa." The statement included the following:

> Q: What is your true and correct name, country of citizenship and date of birth?
> A: FLOYD MURRAY BRUCE, Bermuda, 28-October, 1963.
> Q: What authority issued you the Emergency Certificate which you presented for inspection to the U.S. Immigration Inspectors at JFK Airport in N.Y. City?
> A: Federal Government of Nigeria at Nigerian Immigration HQ in the City of Ogja.
> Q: Why was the Emergency Certificate issued to you by the Nigerian authorities?
> A: I had no document to travel on.
> Q: What happened to your travel documents.
> A: Nigerian Immigration withdrew my British passport.
> Q: Why was your British passport withdrawn by Nigerian

>    Immigration?
>    A: Because I was not the genuine holder of the document and the document had been tampered with.
>    Q: In what way was the document tampered with?
>    A: The photograph was changed from the rightful holder's to my photograph.

The statement goes on to relate that Bruce had been arrested in Nigeria on drug trafficking charges; that he had been tortured there; and that Nigeria had issued him the travel document in question after he was unable to obtain appropriate documents from officials of the United Kingdom.

Following the completion of the statement, Bruce was transported to an INS detention center. He was not prosecuted for any offense at that time. He did, however, remain in INS custody until February of 1993.

It appears that he was detained by the INS because he refused to be removed to Nigeria and could not substantiate his claim to be a native of Bermuda. In an affidavit signed on October 26, 1990, Bruce stated that he had been deported from the United Kingdom to Nigeria in 1988 under the name of Joseph N. Ekwensi, which he averred was not his correct name. He reiterated that he was not a citizen of Nigeria, and that Nigeria deported him to Bermuda in 1989.

Bruce was released on supervision in February of 1993.[2] In January of 2003, he was

---

[2] The saga of Bruce's steadfast denial of Nigerian citizenship and inability to show that he is a subject of the United Kingdom is related in considerable detail in <u>Bruce v. Slattery</u>, 781

sentenced to a prison term of 33 months on a plea of guilty to a charge of bank fraud in violation of 18 U.S.C. § 1344.  See United States v. Bruce, 396 F.3d 697 (6th Cir. 2005), vacated in part, 405 F.3d 1034 (6th Cir. 2005), cert. denied, 126 S. Ct. 466 (2005).[3]  On August 13, 2004, while incarcerated on the bank fraud conviction at FCI Fort Dix, New Jersey, Defendant signed a sworn statement regarding his "right to remain legally in the United States and [his] present status in the United States." (Gov.'s Ex. 13.)  This statement, provided to a BICE officer, consists of handwritten responses to questions that had been typed on the form.  The handwritten information, which Bruce contends was inserted by the BICE officer, includes Defendant's name, place of birth, parents' names, and other information pertaining to his immigration status.  Bruce admits signing the form.  There is no dispute that Bruce was not given Miranda warnings in connection with the submission of this statement.  Bruce, however, acknowledged that the statement was given freely and voluntarily.

Upon completion of his federal sentence, Bruce was taken into custody by BICE and detained at the county jail in Pike County, Pennsylvania.  On August 3, 2005, while in detention at the Pike County Correctional Facility, Bruce was again interviewed by an immigration officer.

---

F. Supp. 963 (S.D. N.Y. 1991), one of several habeas corpus proceedings commenced by Bruce to secure his release from INS detention.

[3]  The original sentence was vacated for re-sentencing in light of United States v. Booker, 543 U.S. 220 (2005).  The sentencing court had imposed a two level adjustment for obstruction of justice based upon a finding that Bruce had misrepresented his citizenship when interviewed by a probation officer.  United States v. Bruce, 396 F.3d at 712-13.  The record is silent as to the sentence imposed on remand.

Bruce voluntarily submitted to the interview, explaining that he wanted answers to questions that he had concerning his confinement. This interview occurred in an office in the prison. Once again, handwritten answers were inserted after typed questions. Bruce reiterated his assertions as to his place of birth, parents, and removal from the United Kingdom to Nigeria. (Gov.'s Ex. 16.) He also acknowledged that he had traveled to Nigeria on a fake passport. Miranda warnings were not made in connection with the solicitation of this statement, which Bruce also acknowledged was given freely and voluntarily.

## II.   DISCUSSION

Bruce contends that each of the statements should be excluded from evidence as a sanction for the failure of the government agents to provide Miranda warnings. It is well-settled than an individual is entitled to Miranda warnings where the government seeks to perform a custodial interrogation. See e.g., United States v. Walton, 10 F.3d 1024, 1026 (3d Cir. 1993). Miranda warnings are required to protect a suspect's Fifth Amendment right against self incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Thus, prior to asking any questions of a suspect in custody, law enforcement officers must inform him that he has the right to remain silent, that his statements may be used against him at trial, that he has the right to the presence of an attorney during questioning, and that if he cannot afford an attorney, one will be appointed for him. Any statement that is the product of un-warned custodial interrogation is subject to an exclusionary rule prohibiting its use at trial.

A person is subject to custodial interrogation when both the elements of custody and interrogation are satisfied.  Rhode Island v. Innis, 446 U.S. 291, 300 (1980).  A person is in custody if, given the circumstances surrounding the interrogation, "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112 (1995); accord United States v. Mesa, 638 F.2d 582, 587 (3d Cir. 1980.)  Interrogation, for Miranda purposes, refers to express questioning or its "functional equivalent."  Innis, 446 U.S. at 300-01.

### A.  The Statement Taken upon Entry to the United States on May 30, 1989

Bruce's challenge to the statements he made when he arrived in the United States on a transit without visa statues presumes the applicability of Miranda to any questioning of his right to that status if he was "in custody."  The circumstances surrounding the questioning related by Bruce at the evidentiary hearing certainly suggest that he was indeed "in custody" when question by immigration officials.  The application of the Miranda rule to the interrogation of aliens at the border, however, is not as clear as Bruce presumes.  As one court has pithily explained:

> Miranda . . . is a mismatch for the immigration process, at least at the outset.  No one believes that the Constitution requires the immigration inspector to greet new arrivals by saying: 'Welcome to the United States.  You have the right to remain silent.  Anything you say may be used against you.  You have a right to counsel and, if you cannot afford a lawyer, one will be appointed for you.  Now, please let me see your passport.'  A person seeking entry into the United

> States does not have a right to remain silent; the immigrant must honestly describe his identity, nationality, business, and claim of entitlement to enter, and must do this without the aid of counsel. The United States is entitled to condition entry on willingness to provide essential information. No information, no entry. Refusing to extend the boon of entry to those who remain silent can be seen as 'compulsion' in the sense that it is a (potentially steep) price tag for remaining silent, yet the government's right to insist on information as a condition of entry cannot reasonably be denied. As a result, the Fifth Amendment privilege no more applies to these questions than the Fourth Amendment blocks the inspection of parcels at the border. . . . Not surprisingly, therefore, many courts have held that persons seeking entry at the border may be questioned without Miranda warnings, even though they are subject to custody until they have satisfied the INS of their right to enter.

United States v. Gupta, 183 F.3d 615, 617-18 (7th Cir. 1999).

The issue presented to this Court with respect to the May 30, 1989 statement was recently addressed by the United States Court of Appeals of the Third Circuit in an analogous factual context in United States v. Kiam. 432 F.3d 524 (3d Cir. 2006), cert. denied, 126 S. Ct. 1453 (2006). Like Bruce, Kiam was directly removed from an aircraft upon its arrival in the United States. Like Bruce, Kiam was escorted to a secondary inspection area, where he was asked questions pertinent to his right to enter the United States. Id. at 526. Kiam had arrived in the United States with three Chinese nationals under circumstances similar to several recently uncovered alien smuggling schemes. The secondary inspection area in Kiam was located behind the primary immigration inspection booths, away from public view. Id. The

interrogation of Kiam by a border inspection officer, like that here, was not preceded by Miranda warnings. When Kiam was confronted with discrepancies based upon passport entries and statements made by the Chinese nationals, he admitted that he was illegally helping the Chinese nationals gain entry into the United States. A BICE Special Agent was then summoned. The Special Agent administered Miranda warnings, and Kiam then proceeded to make a written confession. During the ensuing prosecution for alien smuggling, Kiam moved to suppress the confession on the ground that it was procured through a two-step interrogation strategy intended to evade Miranda. As in the matter before this Court, the premise of Kiam's argument was that he was entitled to Miranda warnings before the border inspector asked him any questions.

The District Court concluded that Kiam was in custody for purposes of Miranda warnings. The Third Circuit, without explicitly affirming the District Court's finding that the defendant was in custody, noted that the District Court had found that "both traditionally triggering elements – custody and interrogation – were present," and then proceeded to discuss whether Miranda warnings were required during the initial questioning. Kiam 432 F.3d at 528-30. It concluded that only after there was "sufficient information to make a determination regarding admissibility," and the questioning was then conducted only to further a potential criminal prosecution, were Miranda warnings required. Id. at 530. The Third Circuit cautioned, however, that "the mere overlap of the admissibility question with the elements of [the

defendant's] criminal liability is not fatal." Id. at n.6.  In other words, questioning of the exact elements of the crime does not necessarily warrant Miranda warnings so long as the purpose of the questioning is to determine the alien's admissibility.  As Judge Van Antwerpen explained:

> An alien at the border of our country – even if that border is the Philadelphia International Airport, as here – must convince a border inspector of his or her admissibility to the country by affirmative evidence.  While an alien is unquestionably in "custody" until he is admitted to the country, normal *Miranda* rules simply cannot apply to this unique situation at the border. . . .  This is a situation utterly unlike a normal law enforcement setting. The alien may be taken out of a primary inspection line for secondary questioning, or as here, removed from a plane before reaching that initial line. Contrary to Kiam's assertions, there is no functional difference between the preceding situations.  In either event, the alien still must meet his information production burden, and the border inspector is accordingly entitled to ask questions and require answers.
>
> We will not impose an across-the-board rule requiring border inspectors to immediately cut off their questioning if they think they may be going beyond what could be considered "routine" immigration questioning. Nor will we extend *Miranda* beyond the holdings of our sister Circuits and hold that if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the alien before questioning him on any subject. Not only would such a rule conflict with . . . *Miranda* jurisprudence, but it would also run afoul of the need for clear rules in the *Miranda* context.
>
> The Seventh Circuit has stated that eventually, a "line must be drawn," beyond which *Miranda* warnings are required. *Gupta,* 183 F.3d at 618. We see only one line to draw – at some point, as was the case here and in *Gupta,* a Customs and Border Protection

> inspector will have sufficient information to make a determination regarding admissibility and will then decide whether to call in a criminal investigator such as Immigration and Customs Enforcement Agent Kozak. *Miranda* may then apply. If the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution, however, this line has been crossed.
>
> . . . This is the only possible "line" which sufficiently reflects the deference due inspectors at the border of the United States. We decline the urging of Kiam to require *Miranda* warnings as soon as an alien is taken off a plane or sent for secondary inspection.
>
> While appealing on the surface, we note the impossibility of the District Court's "particularized suspicion" test. An alien reentering the country after being deported is guilty of a criminal offense. 8 U.S.C. § 1326. Aliens applying for admission at the border are routinely run through a system to check their immigration history. A positive match to a previously-deported alien would lead to secondary inspection, and would surely create a "particularized suspicion" in the mind of any immigration inspector that this alien was guilty of a crime. The criminal offense of illegal reentry is inextricably tied up with the alien's current admissibility, yet by the District Court's reasoning, an immigration inspector would first have to administer *Miranda* warnings before questioning the alien about that admissibility.

Id. at 529 -31 (citations and footnotes omitted).

The questioning of Bruce at the JFK airport, documented in his sworn statement, inquired into his identity, citizenship, and issuance of travel documents – all relevant questions to assessing Defendant's entitlement to transit without visa status through the United States en route to Bermuda. As noted above, applicable regulations imposed on Bruce the obligation of

11

showing possession of valid travel documents "establishing his . . . identity and nationality and ability to enter some country other than the United States." 8 C.F.R. § 212.1(f)(1) (1989). INS officers thus had the right to question Bruce regarding the authenticity of the document he presented, his identity and information pertinent to his ability to enter Bermuda. The fact that Bruce also gave information pertinent to drug trafficking activities in Nigeria did not transform the inquiry into a criminal investigation. It appears that Bruce volunteered this information to explain his fear of being returned to Nigeria, not to implicate him in criminal activity for which he would be prosecuted in the United States. Indeed, Bruce was not subjected to criminal prosecution at the time of his entry into the United States. It was only after his commission of a felony in this country and the inability of the United States to remove him due to his insistence on being a Bermudan national and the equally steadfast position of the United Kingdom that Bruce is really a Nigerian that this prosecution ensued. The interrogation at the JFK airport did not "objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution. . . ." Kiam, 432 F.3d at 530. Accordingly, the statement given at the airport is not subject to being suppressed due to the absence of Miranda warnings.[4]

---

[4] There may be certain parts of the written statement that are subject to exclusion under Federal Rule of Evidence 403 or other rules of evidence. The merits of any evidentiary objection, however, are not before the Court at this time. The statement itself is not subject to the exclusionary rule.

**B.     The August 13, 2004 and August 3, 2005 Statements**

Bruce asserts that he "was clearly in custody when questioned" in prison in August of 2004 (while he was serving his sentence for bank fraud), and in August of 2005 (while he was in detention pending removal proceedings).  Bruce thus asserts that the written statements taken on those occasion must be suppressed because he was not Mirandized.

Contrary to Bruce's assertion, "[j]ust because [he] was already in prison does not mean that he was in a custodial setting."  Burkholder v. Newton, 116 Fed. Appx. 358, 361 (3d Cir. 2004).  "While *Miranda* may apply to one who is in custody for an offense unrelated to the interrogation, *see Mathis v. United States*, 391 U.S. 1, 4-5 (1968), incarceration does not *ipso facto* render an interrogation custodial."  Leviston v. Black, 843 F.2d 302, 303 (8th Cir. 1988). In this regard, "[p]risoner interrogation simply does not lend itself easily to analysis under the traditional formulations of the *Miranda* rule."  United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985).

Because restraint on freedom is the status quo of a prisoner, the courts examine the totality of the circumstances surrounding the interrogation to ascertain whether the defendant should be deemed "in custody" for purposes of Miranda.  See United States v. Menzer, 29 F.3d 1223, 1232 (7th Cir. 1994).  In Burkholder, our Court of Appeals suggested, albeit in a non-precedential opinion, that the pertinent inquiry is whether there is a "'change in the surroundings of the prisoner which results in an added imposition on his freedom of

13

movement.'" 116 Fed.Appx. at 361.  The Burkholder court indicated that "[s]uch a change in surroundings could include the imposition of handcuffs or being taken to a locked room to be questioned by correctional officers."  Id.  As recently explained in United States v. Caro, No. 06-CR-0001, 2006 WL 1594185, at *1 n.1 (W.D. Va. June 2, 2006):

> [A] court should consider the language or means used to summon the prisoner to the interrogation, the prisoner's freedom to leave the scene of the interrogation, the purpose, place and length of the interrogation, any added imposition on the prisoner's freedom of movement and whether circumstances suggest any measure of compulsion above and beyond confinement.

In this case, the circumstances under which Bruce gave the sworn statements to the BICE officers are not such as to suggest that there had been imposed an additional burden on his otherwise constrained freedom of movement while in custody.  As to the statement provided in August of 2004, Bruce explained that he was told it was necessary to obtain the information sought for purposes of processing his deportation.  The interview lasted only about 20 minutes.  He was not handcuffed.   Bruce did not describe any measure of deception or compulsion.  In this regard, although Bruce testified that he was told that answers to the questions were required, he did not state that he would be subjected to any punitive actions were he to refuse to answer the questions.  Bruce testified that he answered the immigration official's questions freely and voluntarily.

As to the statement given in August of 2005, Bruce indicated that he voluntarily met with the immigration official, explaining that he wanted to meet with the official because he had

14

questions concerning his confinement.  The interview occurred in an office within the prison. He acknowledged that he was not handcuffed or otherwise restrained. He also testified that this statement was also given freely and voluntarily.

Under these circumstances, it cannot be said that Bruce was in a custodial setting at the time he gave these statements..  Therefore, Miranda did not apply.  See Garcia v. Singletary, 13 F.3d 1487, 1489-91 (11th Cir. 1994).

Nor does it appear that the basic questions asked of Bruce were subject to Miranda.  In Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990), the Court indicated that routine booking questions "reasonably related to the police's administrative concerns" are not covered by Miranda.  The questions on the statements given in August of 2004 and August of 2005 concern Defendant's name, his use of other names, his citizenship, date and place of birth, his parents' names and citizenship, his entry into the United States, whether he had ever been ordered deported from the United States, and whether he had any fear of persecution or torture should he be removed from the United States.  These basic questions appear related to administrative concerns of immigration officials confronted with the question of what to do with a person who is clearly not a United States citizen.  The rationale of Muniz would seem to remove such questioning from the ambit of Miranda.

There is, however, no need to decide this issue here.  It is clear that the statements were not elicited in a custodial setting.  Bruce was already incarcerated and the circumstances

do not indicate "the type of coercive situation that was the source of concern in Miranda and its progeny." Isaacs v. Head, 300 F.3d 1232, 1267 (11th Cir. 2002), cert. denied, 538 U.S. 988 (2003).  Accordingly, neither statement will be suppressed.

### III.    CONCLUSION

For the reasons set forth above, the motion to suppress will be denied.  An appropriate Order follows.


                                            **s/ Thomas I. Vanaskie**
                                            Thomas I. Vanaskie, Chief Judge
                                            Middle District of Pennsylvania

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**MURRAY FLOYD BRUCE** :
       **Plaintiff** :
    **VS.** :    **3:CV-05-318**
         :    **(CHIEF JUDGE VANASKIE)**
**UNITED STATES OF AMERICA** :
       **Defendant** :

## ORDER

**NOW, THIS 13TH DAY OF JULY, 2006**, for the reasons set forth in the accompanying Memorandum, **IT IS HEREBY ORDERED THAT**

1. Defendant's Motion to Suppress Statements (Dkt. Entry 23) is **DENIED**.

2. A telephonic scheduling conference will be held on July 28, 2006, at 10:00 a.m.

Counsel for the government is responsible for making the arrangements for the conference call.

                                              **s/ Thomas I. Vaskie**
                                              Thomas I. Vanaskie, Chief Judge
                                              Middle District of Pennsylvania